UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHARLES DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00222-MG-JPH |
| | ) | |
| CHARLES DUGAN, | ) | |
| RICHARD BROWN, | ) | |
| JERRY SNYDER, | ) | |
| RANDALL PURCELL, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part Defendants' Motion for Judgment as a Matter of Law and Denying Motion for a New Trial**

Plaintiff Charles Dawson, an Indiana prisoner, filed this civil rights action alleging that he was confined on Department Wide Administrative Segregation for an extended period of time without due process and that the conditions of that confinement violated his Eighth Amendment rights. Dkt. 61 at 1. A trial was held, and the jury found defendants Charles Dugan, Jerry Snyder, and Dick Brown liable to Mr. Dawson. These defendants now seek judgment as a matter of law in their favor pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial pursuant to Rule 59(a). Defendants argue that Mr. Dawson failed to establish all of the elements of his claims and that the jury was improperly instructed regarding supervisory liability. Mr. Dawson responded, and Defendants replied.

For the reasons explained below, the motion for judgment as a matter of law, dkt. [169], is **granted in part and denied in part**, and the alternative motion for new trial, dkt [169], is **denied.**

1

# I. Background

Mr. Dawson's claims arise out of the 16-month period he spent in Department Wide Administrative Segregation ("DWAS"), a restrictive housing unit at Wabash Valley Correctional Facility, from October 30, 2018, until his transfer to another prison sometime in March 2020.

## A.  Verdict

A three-day trial was held, and the jury found as follows:

On Mr. Dawson's Eighth Amendment conditions claim, the jury found for Mr. Dawson in the amount of $1 and found punitive damages against Mr. Dugan, $5,000; and Mr. Snyder, $20,000.

On Mr. Dawson's Fourteenth Amendment due process claim, the jury found for Mr. Dawson and awarded him $30,000 in compensatory damages and awarded punitive damages against Mr. Dugan, $10,000; Mr. Brown, $40,000; and Mr. Snyder, $45,000.

The jury found for Mr. Purcell on both claims and for Mr. Brown on the conditions claim.

## B.  Evidence Adduced at Trial

The evidence presented at trial taken in the light most favorable to Mr. Dawson includes the following:

### 1.  *Disciplinary Segregation*

When a prisoner is found guilty of conduct that violates a prison rule at a disciplinary hearing, he may be sanctioned with time in disciplinary segregation. Dkt. 175 at 92.  Disciplinary segregation cells are single-man concrete cells with solid doors in a separate wing of the prison. *Id.* at 93 and 163. Prisoners in disciplinary segregation are generally in their cell for 23 hours a day. *Id.* at 94. There are no windows, and a light is on at all times. *Id.* at 94-95. Prisoners are

permitted to spend one hour a day outside alone in a caged-in area where they can talk to other prisoners through the fence. *Id.* at 96.

### 2. Department Wide Administrative Segregation (DWAS)

Prisoners are placed in DWAS at the discretion of the internal affairs office and the Warden. Dkt. 175 at 98. Unlike disciplinary segregation, there is no set out date. *Id.* at 99. The cells are nearly identical to those in the disciplinary segregation wing. There are three concrete walls and a perforated cell door that faces out towards a wall. Dkt. 178 at 158. Disciplinary segregation cells had a non-perforated solid slab door. *Id.* at 169. The cell contains a bed, desk, and toilet. *Id.* Mr. Dawson's cell did not have a chair. Dkt. 178 at 158. There are no visible windows, and prisoners are generally confined to their cell for 23 hours a day. Dkt. 175 at 99. A low wattage nightlight is in each cell so that correctional officers can regularly inspect the cells. Dkt. 178 at 159. This same light is present in general population cells. *Id.* at 140-141. Mr. Dawson testified that the light made him feel restless, grumpy, and not well. *Id.* at 193.

Mr. Dawson has a rod in his leg which causes leg pain and makes sitting on hard surfaces difficult. Dkt. 178 at 170. Even while in DWAS, Mr. Dawson was able to sit comfortably on his bed and had access to pain medications to reduce his leg pain. *Id.* at 171.

Prisoners in DWAS are permitted an hour outside their cell alone in a small caged-in area with a basketball goal and ball. Dkt. 175 at 100, 160. This one hour of recreation was the only time Mr. Dawson saw outside. *Id.* at 162. Birds nested in the fencing surrounding the recreation cages, so bird feces were all over the recreation yard. *Id.* at 164. Indoor recreation was time alone in a room with a pull-up bar and basketball goal. *Id.* at 161. The roof of the indoor recreation area was half covered in stained plexiglass and the other half was open to the sky. *Id.* at 195.

Mr. Dawson was permitted to leave his cell to shower three times a week. Dkt. 178 at 160.

Prisoners on DWAS can yell to communicate with each other, but they cannot see each other face to face. Dkt. 178 at 163.

Like disciplinary segregation, administrative segregation limits phone calls to one call for 15 minutes each week. Dkt. 178 at 162-163. In person visits were limited to 45 minutes without contact. *Id.* at 163, 178. Materials could be requested from the law library, but prisoners in DWAS could not go to the library. *Id.*

Food could be ordered from commissary and cooked with a hot pot, but no microwave was available. Dkt. 178 at 168.

Mr. Dawson testified that cold air would enter his range through an exterior door, and he would put on his thermals, sweat suit, and uniform to stay warm. Dkt. 178 at 188. The cold bothered the metal in his leg, causing pain. *Id.* at 193. In the summer, the air conditioner was not working on Mr. Dawson's range, so officers opened the door at the end of the range for fresh air and a fan was permitted. *Id.* at 188. Field mice were able to enter the range. *Id.*

General population allows for more freedom and socialization. Many prisoners share a cell. Dkt. 178 at 169. Meals can be eaten in the chow hall, there is recreation with weights, video games, basketball, and billiards. Prisoners can socialize with other prisoners and can cook food in the microwave. Jobs and other programming are available. *Id.* at 167.

Mr. Dawson testified that not being able to move about the prison and attend visitation with his family and girlfriend was "depressing over time" and he often felt lonely. Dkt. 178 at 218. He found his time alone to be a "difficult situation to deal with. . . ." *Id.*

Mr. Dawson further testified that he told Mr. Dugan that he did not like where he was at. Dkt. 178 at 219.

### 3.  Mr. Dawson's Placement in DWAS

Mr. Dawson was held in a solitary cell from the time he arrived at Wabash Valley Correctional Facility until his transfer. On October 26, 2018, Mr. Dawson was completing a one-year term of disciplinary segregation as a result of a trafficking violation. Dkt. 178 at 84-85. At that time, Mr. Snyder sent an email stating that Mr. Dawson was being processed for placement on DWAS. Exhibit 3-A.

On November 1, 2018, Warden Richard Brown reviewed and signed off on a memorandum sent to Michael Osborn, the Southern Regional Director, recommending that Mr. Dawson be placed in DWAS. Exhibit 8; dkt. 178 at 139. The recommendation was based on Mr. Dawson's involvement in a trafficking ring and thirteen conduct violations. *Id.* That same day, Mr. Dawson was transferred to administrative segregation. Dkt. 175 at 102-104. He was given a Report of Classification Hearing form which did not provide any information about his right to appeal. Exhibit 1-A; dkt. 178 at 84. The form did not explain why Mr. Dawson was being transferred to DWAS or how long he would be there. *Id.* at 85.

### 4.  Report of Classification Hearing

Indiana Department of Corrections ("IDOC") policy provides that a series of classification reviews must be completed to maintain someone in DWAS. Dkt. 175 at 104. Specifically, prisoners are entitled to a review every week during the first two months of their placement in DWAS. *Id.* at 105. Mr. Dugan was responsible for completing these weekly reviews for Mr. Dawson during his first 60 days in DWAS. The weekly reviews included the completion of a "Report of Classification Hearing" form. *See* Exhibits 1-B, 1-C, 1-D, 1-E, 1-G, 1-H. When completing these forms, Mr. Dugan did not recommend that Mr. Dawson be reviewed for release. *Id.* at 109, 114.  Mr. Dugan did not complete the section of the form titled "recommendation and

basis." Exhibits 1-B, 1-C, 1-D, 1-E, 1-G, 1-H. Nor do these forms provide any information as to why Mr. Dawson should remain on DWAS. *Id.*

Mr. Dugan explained that he did not have the authority to Order Mr. Dawson's release from DWAS, but that his weekly reviews could be an opportunity to start the process to be reviewed for release from DWAS. Dkt. 175 at 100. Mr. Dugan testified that Mr. Dawson could have asked to be reviewed for release, but there is no information on the form that explains that fact. *Id.* at 114.

### 5. 30-Day Reviews – October 2018 through January 2019

Beginning in October 2018, Mr. Dugan began producing what are known as 30-day reviews for Mr. Dawson. Dkt. 175 at 118. The purpose of the 30-day review is to determine whether a reason for segregation still exists for an inmate. *Id.* at 101-102. Every prisoner in administrative segregation was entitled to a 30-day review. *Id.* at 102.

Mr. Dugan completed the 30-day reviews for October, November, December, and January, in less than a minute by simply updating the date on a prepared computer form. *Id.* at 120; *see* Exhibit 2-A, 2-B, 2-C, 2-D. No information was actually reviewed in completing these forms. *Id.* Mr. Dugan was taught to complete these forms in this manner by Mr. Snyder. Dkt. 175 at 142-143. These reviews would not result in Mr. Dawson's release from DWAS. Dkt. 175 at 121 and 127. Nowhere on the forms does it state that Mr. Dawson could appeal the decision. *Id.* These reviews did not indicate what Mr. Dawson should be doing to get off of DWAS. *Id.* at 128.

### 6. ACT Program

On December 18, 2018, Mr. Dugan completed another Report of Classification Hearing form. Exhibit 1-F. Again, he did not provide any reason for his recommendation that Mr. Dawson remain in administrative segregation. He did, however, refer Mr. Dawson for participation in the ACT program. *Id.*; dkt. 175 at 115. The ACT program is a nine-month program for prisoners in DWAS. There are multiple parts to the program, some of which cannot be completed while in

DWAS at Wabash Valley Correctional Facility. *Id.* at 115-116. The ACT program in DWAS consists of two volunteers talking simultaneously to 12 inmates who are locked in 12 different cells on two different floors once a week. Dkt. 178 at 77-78.

### 7. *30-Day Reviews – February 2019 through May 2019*

Beginning in February 2019, and continuing through May 2019, the 30-day review forms were identical but added a paragraph that stated:

> Placement on Department-Wide Administrative Status Housing may be appealed by submitting a Classification Appeal (SF 9260) within ten working days of admission to a Department-Wide Restrict Status Housing Unit or any subsequent Classification action (i.e., 30 Day or 90 Day reviews).

Exhibits 2-E, 2-F, 2-G, and 2-H. In completing these reviews Mr. Dugan also reportedly reviewed: "reason for current placement, conduct history, Program participation, OCMS notes, interactions with staff and other offenders." *Id.*; dkt. 175 at 129-130. None of these reviews reflected that Mr. Dugan recommended that Mr. Dawson's be reviewed for release from administrative segregation. Dkt. 175 at 131. These reviews took ten to fifteen minutes to complete. *Id.* at 171.

### 8. *Full 90-Day Reviews*

A full review (also referred to as a 90-day review) was the only process which could result in transfer out of DWAS. Dkt. 175 at 174. The full 90-day reviews do not happen automatically every 90 days and an inmate must wait at least 90 days after receiving the results of a full review before requesting another full review. Dkt. 178 at 54 and 176. It can take months for prison staff to complete a full review. *Id.* at 170. Mr. Dawson was never told how to apply for a full review, and he was never asked if he wanted a full review. *Id.* at 174-175. If a full review occurs, the prisoner is notified of the results when a decision has been made. Dkt. 178 at 55.

On March 14, 2019, Mr. Dawson submitted a Classification Appeal through the institutional mail. In the appeal, he reported that he had been on DWAS since October 30, 2018,

but had not received a 30-day or 90-day review to see if his state of mind had changed so that he could be placed back in general population. He also stated that he was not a threat to the safety or security of the facility and was requesting immediate release back to general population. Exhibit 5; dkt. 178 at 131. No full review was ever completed as a result of this Classification appeal.

Mr. Dawson filed this lawsuit on May 7, 2019, and service was issued to the defendants on June 18, 2019.

On June 25, 2019, Mr. Snyder sent an email to Mr. Purcell asking him to "[p]lease do a staff initiated full review on [] Dawson #162406. When you make the OCMS note and on the review itself, please note that it is staff initiated. Thank you." Exhibit 3-E; Dkt. 178 at p 58. Mr. Snyder sent this request after the IDOC Director of Classification requested copies of initial review, 7-day review, 30-day reviews, any full reviews, annuals reviews and the Behavioral Modification Plan for Charles Dawson. Exhibit 3-D.

### 9. Behavior Modification Plan

Prisoners are entitled to receive a behavior modification plan within three days of their admission to administrative segregation. Dkt. 175 at 112-113. However, Mr. Dugan provided this completed form to Mr. Dawson on June 25, 2019 (eight months after Mr. Dawson was placed in administrative segregation). *Id.* It recommends that Mr. Dawson participate in every program listed: ACT program; Education (Literacy or TASC); Thinking for a Change, if available; MRT Group, if available; Independent Study – Anger Management; Independent Study – Substance Abuse. Exhibit 4. Mr. Dugan's understood that completion of this programming would assist Mr. Dawson in getting moved off of administrative segregation. Dkt. 175 at 112.

*10. 30-Day Reviews – June 2019 through September 2019*

The June 2019 30-day review included additional language. Exhibit 2-I. Mr. Dugan wrote: "Upon successfully completing the four phases of the ACT Program a Department-Wide Administrative Restrict Housing Status review will be conducted to determine eligibility for release to complete Phase 5." *Id.*; dkt. 175 at 131-132.

On July 1, 2019, a new 30-day review form was adopted by the IDOC. Dkt. 175 at 133; 178 at 71. This form provided the same relevant information as the June 2019 30-day review. *Compare* Exhibit 2-J to 2-I. The 30-day review forms for July, August, and September are identical expect for the date. Exhibits 2-K, 2-L; dkt. 175 at 135.

*11.* Mr. Dawson's 90-day Review

On August 6, 2019, Jerry Snyder sent an email addressed to Charles Dugan and others. This email set forth the result of a full 90-day review providing that Mr. Dawson was "Denied due to OII [Office of Investigation and Intelligence] information of his involvement in a major trafficking ring at MCF in 2017. Will recommend approval with 2 years clear conduct in November 2019." Exhibit. 3-G. Mr. Snyder instructed staff to "advise offenders of the outcome and make an appropriate OCMS note." *Id.* Mr. Dawson's involvement with the trafficking ring is the same conduct that resulted in his disciplinary segregation sanction. Dkt. 175 at 180. At that time, Mr. Dawson did not have other disciplinary conduct violations. *Id.*

That same day, Mr. Dugan completed a Report of Classification Hearing which told Mr. Dawson for the first time that he would not get off of administrative segregation until November 2019, at the earliest. Exhibit 1-J; Dkt. 175 at 181. At this time, Mr. Dugan understood that even if he recommended a review, Mr. Dawson would not have the opportunity to be released from administrative segregation for at least three months. Dkt. 175 at 182.

*12. 30-Day Reviews – November 2019 through January 7, 2020*

On November 14, 2019, Mr. Dugan completed a 30-day review that recommended Mr. Dawson be reviewed for transfer given his overall positive adjustment and because he had recently completed phase 4 of the ACT program. Exhibit 2-M. Mr. Dugan recommended that Mr. Dawson be reviewed for release to phase 5 on the ACT program. *Id.*; dkt. 175 at 136-137. Mr. Dugan's recommendation could result in a full review. Dkt. 175 at 139-140.

On January 7, 2020, Mr. Dugan completed another 30-day review. This review reflects that Mr. Dawson remained in DWAS awaiting a decision on his release. Exhibit 2-N.

No one was ever released as a result of a 30-day review or the appeal of a 30-day review. Dkt. 175 at 173-174.

*13. Charles Dugan*

Mr. Dugan is a caseworker at Wabash Valley Correctional Facility. Dkt. 175 at 91. He provides reviews and programming, assists with attorney-client phone calls, and delivers legal mail and law library items. *Id.* Between 2018 and 2020, Mr. Dugan monitored prisoners in both the disciplinary segregation area and the administrative segregation areas. *Id.* at 97. Between 2018 and 2020, one of Mr. Dugan's responsibilities was to conduct 30-day reviews. Mr. Snyder instructed Mr. Dugan on the language to use when completing the reviews. Dkt. 178 at 92.

Mr. Dugan reported to casework manager Randall Purcell, Unit Team Manager Jerry Snyder, and Warden Richard Brown. Dkt. 175 at 100-101. During Mr. Dawson's time in administrative segregation, Mr. Dugan would stop and talk to him regularly and never had any issues with him. Dkt. 175 at 151.

*14. Randall Purcell*

Mr. Purcell was a caseworker at Wabash Valley Correctional Facility during the times relevant to the claims. Dkt. 178 at 11-12. He reported to Jerry Snyder. Mr. Purcell never assisted

Mr. Dugan with the inmates held in administrative segregation. *Id.* at 12-13. Mr. Purcell's only involvement with Mr. Dawson was initiating his two 90-day reviews. *Id.* at 13; Exhibit 1-I. Mr. Purcell would initiate a review in response to a staff or prisoner's request for a 90-day review. Dkt. 178 at 37. He would forward a questionnaire to the prisoner. That questionnaire asked prisoners why they are in segregation, what would they like the Office of Investigation and Intelligence (OII) to know, and how they have bettered themselves in the last 90-days. *Id.* A completed questionnaire would then be sent to the decisionmakers including the housing lieutenant, Mr. Snyder, OII, the deputy warden of reentry and the warden. Dkt. 178 at 38 and 98. Mr. Purcell testified that he sent this questionnaire to Mr. Dawson in July, but never received a response. *Id.* at 38. But Mr. Dawson testified that he was never provided a 90-day questionnaire. *Id.* at 178.

Mr. Purcell also initiated a full review in November 2019, after Mr. Dawson had completed the four phases of the ACT program available in administrative segregation. *Id.* at 40.

### 15. Jerry Snyder

Mr. Snyder was a Unit Team Manager. Dkt. 178 at 48. He testified that the purpose of the 30-day review was to determine whether a prisoner should remain in administrative segregation because he is a threat to the facility. *Id.* at 51. He understood that before March 2019, the 30-day reviews were simply prepared forms that took about 30 seconds to complete. Dkt. 178 at 51-52. Mr. Snyder never disciplined Mr. Dugan for spending 30 seconds on 30-day reviews. *Id.* at 52. He believed that Mr. Dugan completed reviews for about 72 inmates in 30 minutes. Dkt. 178 at 105. Mr. Snyder also understood that during the relevant time period, no one was ever released from administrative segregation as a result of a 30-day review. *Id.* Mr. Snyder put the 30-day review protocol in place. Dkt. 175 at 179.

Mr. Snyder testified that he could have requested a full review of Mr. Dawson but did not do so until June of 2019, after this lawsuit was filed. Dkt. 178 at 72, 117-118. He further acknowledged that prisoners are never told how to request a full review which is the only review that can result in removal from administrative segregation. *Id.* at 72-73. In addition, Mr. Snyder was responsible for advising that Mr. Dawson's transfer was denied because he was involved in trafficking at Miami Correctional Facility in 2017. *Id.* at 73. It was Mr. Snyder's recommendation that Mr. Dawson be approved for transfer only after two years of clear conduct. *Id.* at 74.

### 16. Richard Brown

Mr. Brown was the Warden at Wabash Valley Correctional Facility. Dkt. 178 at 119. He understood that the 30-day reviews were conducted by individuals who had no authority to make the decision to release someone from administrative segregation. *Id.* at 122. Nor was there any review of individual prisoner's characteristics during the 30-day reviews. *Id.* Warden Brown, along with Mr. Snyder, put the 30-day review protocol in place. Dkt. 175 at 179.

Mr. Brown was the decision maker at the facility level for all 90-day full reviews. Dkt. 178 at 123. Mr. Brown testified that staff may request 90-day reviews, but that does not happen very often. *Id.* at 124. Thus, if neither staff nor a prisoner requests a 90-day review, then a 90-day review is not conducted, and the prisoner would remain on administrative segregation indefinitely. Dkt. 178 at 131. Before a prisoner would be transferred out of DWAS, Mr. Brown would have to recommend release and then that recommendation would be submitted to central office for final approval. *Id.* at 138.

## II. Motion for Judgment as a Matter of Law

Now before the Court is Defendants' Second Motion for Judgment as matter of Law and Motion for New Trial in the Alternative. Dkt. 169. Defendants argue that they are entitled to judgment as a matter of law because Mr. Dawson failed to establish one or more elements of his conditions claim and

because there was insufficient evidence to establish that Mr. Dawson was deprived of a meaningful review as required to support his due process claim. Defendants also seek qualified immunity on all claims.

Rule 50 provides that this Court may enter judgment as a matter of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to support the verdict. Fed. R. Civ. P. 50(a)(1), (b). The Rule 50 "standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) [and 50(b)] motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 143 S. Ct. 1382, 1387 (2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986)). Thus, in reviewing the motion for judgment as a matter of law, the Court draws all reasonable inferences in Mr. Dawson's favor. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 674 (7th Cir. 2022). The Court must "must affirm the jury's verdict 'unless there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.'" *Id.* at 675 (quoting *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc) (quotation marks omitted)). A Rule 50(b) motion may be granted "only on grounds advanced in the pre-verdict motion." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 659 (7th Cir. 2021) (quoting *Abellan v. Lavelo Property Mgmt.*, LLC, 948 F.3d 820, 827 (7th Cir. 2020)).

The defendants' Rule 50(b) motion seeks judgment as a matter of law based on the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)

(quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)). "A state official is protected by qualified immunity unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Reed v. Palmer*, 906 F.3d 540, 546–47 (7th Cir. 2018).

"Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). Qualified immunity "ordinarily should be decided by the court long before trial," *Hunter*, 502 U.S. at 228, "because '[t]he entitlement is an immunity from suit rather than a mere defense to liability,'" *id.* at 227 (quoting M*itchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) ("Qualified immunity protects a defendant from liability as well as from the burden of standing trial. For that reason, courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity."). However, when defendants raise a qualified immunity defense in their answer, dkt. 16 at 2, they do not waive that defense simply by waiting until after trial to assert this defense in a post-trial motion. Instead, there are occasions when a complete factual record is necessary. *See Emad v. Dodge Cnty.*, No. 22-1876, 2023 WL 4188509, at *5 (7th Cir. June 26, 2023) (concluding that summary judgment awarding qualified immunity to defendants was improper when the factual basis supporting the claims was unclear).

14

### A.  Conditions of Confinement Claims

The jury found for Mr. Dawson on his Eighth Amendment conditions of confinement claim, awarding him $1.00 in nominal damages and assessing punitive damages against Mr. Dugan, $5,000; and Mr. Snyder, $20,000. Mr. Dugan and Mr. Snyder now argue that they are entitled to judgment as a matter of law because Mr. Dawson failed to prove both the objective and subjective standards of his conditions of confinement case and because they are entitled to qualified immunity. Dkt. 170 at 13. For the reasons explained below, Mr. Dugan and Mr. Snyder are entitled to qualified immunity on this claim.

"'[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Johnson v. Prentice*, 29 F.4th 895, 904 (7th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is known as the deliberate indifference standard. Thus, an Eighth Amendment claim has subjective and objective elements, "each of which must be satisfied." *Quinn v. Wexford Health Sources, Inc*., 8 F.4th 557, 565 (7th Cir. 2021).

### *1. Objective Element*

Defendants argue that Mr. Dawson has failed to establish the objective element of the deliberate indifference standard because there was insufficient evidence upon which the jury could conclude that the conditions in DWAS show a strong likelihood of serious harm. Dkt. 170 at 3. In response, Mr. Dawson argues that the evidence supports the conclusion that he was subjected to extreme temperatures,[1] was denied proper seating which exacerbated the pain caused by the rod

---

[1] Describing the temperatures as "extreme" is somewhat misleading. Mr. Dawson testified that, when the temperature was cold, "we would just have to put our thermals, our sweat suit and uniform that they give

in his leg, was subjected to sleep deprivation because the lights were on constantly,[2] had no window in his cell, and suffered as a result of the limited opportunity to exercise. Dkt. 179 at 2. These conditions, he asserts, satisfy the objective element of his conditions claim.

For the purposes of resolving the Defendants' motion for judgment as a matter of law, the Court assumes that these conditions are objectively sufficiently serious. *Thomas v. State of Illinois*, 697 F.3d 612, 614–15 (7th Cir. 2012) ("a trier of fact might reasonably conclude that the prisoner had been subjected to harm sufficient to support a claim of cruel and unusual punishment even if he had not contracted a disease or suffered any physical pain.").

### *2. Subjective Element*

Next, Mr. Dugan and Mr. Snyder argue that they are entitled to judgment as a matter of law because there is no evidence that they were aware of the risks Mr. Dawson faced as a result of the temperature, lack of table and chair, sleep deprivation, or inadequate exercise. Dkt. 170 at 5. Nor is there any evidence that they had any authority to change the challenged conditions or that they failed to take reasonable measures to abate the risk of serious injury posed by the challenged conditions. Dkt. 170 at 5-7.

Mr. Dawson disagrees. He explains in response:

Testimony established that personnel at Wabash was aware that the lights were on constantly, that there was no air conditioning in the summer. The liable defendants did not dispute the testimony of [Mr.] Dawson as to those conditions. All liable defendants

---

us to stay warm in there." See Dkt. 178 at 241. Also, when the air conditioning was not working, staff would "open up the door to -- the end of the door at the end of the range for us to get fresh air. And I think we were allowed a fan in there, too." *Id.*

[2] The same light is on in general population cells.

were aware that the administrative segregation cells were located in a separate wing, and were identical to the disciplinary segregation cells.

Dkt. 179 at 4.[3] But, knowledge of the presence of safety lights and a lack of air conditioning is not sufficient to establish Mr. Dugan's and Mr. Synder's personal liability. There is no evidence that Mr. Dawson ever complained about the temperature or his inability to sleep to either Mr. Dugan or Mr. Synder. There was no evidence that either defendant was aware that Mr. Dawson had a metal rod in his leg that required additional accommodations. There is no evidence that Mr. Dugan or Mr. Synder were responsible for the temperature in Mr. Dawson's cell, the furniture available, the lighting, or the recreational facilities. "Simply put, [the defendants] cannot be held liable for failing to do something [they] had no authority to do." *Hunter v. Mueske*, 73 F.4th 561, 566–67 (7th Cir. 2023) (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights ... Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.")). The possibility that they could have done more does not evince deliberate indifference. *Hunter*, 73 F.4th at 567.

Mr. Dawson makes a novel argument based on the theory that he was subjected to unconstitutional conditions of confinement every time he was provided a 30-day review, which suggested that someone had reviewed his situation in segregation and denied release. Dkt. 179 at 3-8. Mr. Dawson argues that:

> Dugan was part of the fraud and the psychological torture resulting from these fraudulent 30-day reviews designed to make an inmate think that he had yet failed again to secure release. All of the defendants testified and acknowledged that the 30-day reviews were not really reviews, were simply "cut and paste" from month

---

[3] Mr. Dawson further states that "All liable defendants were aware as to the solitary confinement protocols and the dangers of prolonged confinement." Dkt. 179 at 4. In support of this statement, Mr. Dawson points to Exhibit 8 which is a Memorandum from Warden Brown to Michael Osburn stating, "Per mental health evaluation by Dr. Sims, Psychologist, [Mr. Dawson] does not exhibit current signs or symptoms of an AXIS 1 Diagnosis and is not at high risk to decompensate in a SCU." Exh. 8. This evidence reflects that Mr. Dawson was not expected to decompensate in the segregation.  In addition, there was no testimony that Mr. Dugan or Mr. Snyder were aware that Mr. Dawson faced an excessive risk of psychological injuries caused by prolonged confinement in solitary conditions.

> to month, and that a 30-day review had never resulted in an inmate's release. It simply was not designed that way. Dawson was never told that. He was led to believe otherwise, each and every month for over a year. The jury was free to conclude that this ruse caused severe mental and emotional harm.

*Id.* at 3-4. This argument fails because Mr. Dawson's Eighth Amendment right to humane conditions of confinement does not include the right to due process. A fraudulent review process is not a condition of confinement that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise. *See Isby*, 856 F.3d at 522 (discussing conditions of confinement claims in context of long term segregation). Instead, the sham 30-day reviews directly implicate Mr. Dawson's due process rights and Mr. Dawson can gain "nothing by attracting additional constitutional labels." *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989) (constitutional claims must be addressed under the most applicable provision)).

### 3. Qualified Immunity

Finally, Defendants argue that Mr. Dugan and Mr. Snyder are entitled to qualified immunity on the Eighth Amendment conditions of confinement claim because Mr. Dugan and Mr. Snyder did not violate Mr. Dawson's constitutional rights and because "there is no authority clearly establishing the right that would put the question beyond debate." Dkt. 170 at 13-14.

Once qualified immunity is raised, the plaintiff, not the defendant, carries the burden of overcoming the affirmative defense. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (*citing Spiegel v. Cortese*, 196 F. 3d 717 (7th Cir. 1999)). In response, Mr. Dawson argues that Defendants waived their qualified immunity defense by not raising it until seeking judgment as a matter of law under Rule 50(a). But Mr. Dawson offers no legal support for his claim that the qualified immunity defense has been waived. Dkt. 179 at 10-11. When defendants raise a qualified immunity defense in their answer, dkt. 16 at 2, they do not waive that defense

18

simply by waiting until after trial to assert it in a post-trial motion. Instead, there are occasions when a complete factual record is necessary. *See Emad v. Dodge Cnty.*, No. 22-1876, 2023 WL 4188509, at *5 (7th Cir. June 26, 2023) (concluding that summary judgment awarding qualified immunity to defendants was improper when the factual basis supporting the claims was unclear). Now that the record is fully developed and qualified immunity has been raised, Mr. Dawson has the burden of showing that every reasonable official would have understood that the conditions in DWAS were unconstitutional. *Reed v. Palmer*, 906 F.3d 540, 546–47 (7th Cir. 2018).

In an apparent effort to defeat the qualified immunity defense, Mr. Dawson points to *Woodward v. Correctional Medical Services of Illinois, Inc.,* 368 F.3d 917, 930 (7th Cir. 2004) (affirming a punitive damages award in a § 1983 action where defendants disregarded procedures and were not properly trained). Dkt. 179 at 13. But *Woodward* does not establish that any of the conditions Mr. Dawson faced, either individually or collectively, violated his Eighth Amendment rights. To the contrary, in *Isby v. Brown*, 856 F.3d 508, 522 (7th Cir. 2017), the Seventh Circuit affirmed the district court's conclusion that complaints relating to the lighting, food, temperatures, sleeping arrangements, the restricted time for showers and exercise, and so forth, do not rise to the level of extreme deprivation of basic human needs required to satisfy Eighth Amendment.

In the absence of any evidence that Mr. Dugan or Mr. Synder were deliberately indifferent to the harm Mr. Dawson faced as a result of the lighting, temperature, and other conditions in DWAS, they are entitled to Judgment as a Matter of Law on the Eighth Amendment conditions of confinement claims. In addition, because not every reasonable official would have understood that the conditions in DWAS were unconstitutional, Mr. Dugan and Mr. Synder are entitled to qualified immunity on the Eighth Amendment claim.

Accordingly, an Amended Judgment shall be entered reflecting that Defendants Charles Dugan and Jerry Snyder are entitled to qualified immunity on the conditions of confinement claim.

### B. Due Process Claim

On Mr. Dawson's Fourteenth Amendment due process claim, the jury found for Mr. Dawson and awarded him $30,000 in compensatory damages and awarded punitive damages against Mr. Dugan, $10,000; Mr. Brown, $40,000; and Mr. Snyder, $45,000.

Defendants raise four arguments in support of their motion. First, they argue that the Court should find as a matter of law that Mr. Dawson's confinement in DWAS did not implicate a liberty interest. Dkt. 170 at 8. Second, even assuming a liberty interest was implicated, the Court should find that no reasonable jury could find that Mr. Dawson was denied periodic and meaningful reviews. *Id.* at 10-12. Third, Mr. Brown and Mr. Snyder are entitled to judgment as a matter of law because they lacked personal involvement. *Id.* at 12-13. Finally, Defendants argue they are entitled to qualified immunity. *Id.* at 13. For the reasons explained below, all four of Defendants' grounds for relief are denied.

#### 1. Liberty Interest

"[A] liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009) (emphasis in original). Defendants argue that Mr. Dawson's confinement in DWAS does not implicate a liberty interest. They explain, "[w]hile Plaintiff's length of confinement" in DWAS "tips this case towards a liberty interest, the record must reveal that the conditions of confinement are unusually harsh." Dkt. 170 at 9; *see also* dkt. 180 at 7-9.

Defendants argue that the evidence was insufficient to show that that the conditions Mr. Dawson faced were unusually harsh. *Id.* Defendants are mistaken. Mr. Dawson was

indefinitely confined in a solitary windowless cell for 23 hours a day for 16 months. This evidence was sufficient for a jury to conclude that the conditions Mr. Dawson faced were unusually harsh.

Defendants argue in reply that Mr. Dawson was required to present evidence that the conditions at issue were more restrictive than those faced at the most restrictive prison in the same state. Dkt. 180 at 8 (citing *Westefer v. Snyder*, 422 F.3d 570, 585 (7th Cir. 2005)). But Defendants have waived that specific issue by not first raising it in their Rule 50(a) motion prior to the close of evidence. *See* dkt. 177 at 9-13. In addition, Defendants effectively conceded that Mr. Dawson had a liberty interest in avoiding placement in DWAS because they did not request a jury instruction on this issue, nor did they object to Final Instructions 14 or 15 on this basis. Dkt. 152 at 15-16; dkt. 178 at 233-234. Instead, they presumed that a liberty interest was at stake, consistent with their proposed case-specific instructions. Dkt. 120-at 5. Further, the parties did not respond to the Court's order requesting a stipulation on this issue, which reflects the Court's efforts to bring this issue to the parties' attention prior to trial. Dkt. 142 at 2.

In any event, the evidence adduced at trial was sufficient to establish that Mr. Dawson had a liberty interest in avoiding his 16-month DWAS placement. Spending 23 hours a day alone in a cell for 16 months is unusually harsh, particularly when the placement is indefinite. *Beamon v. Pollard*, 711 F. App'x 794, 795–96 (7th Cir. 2018) ("Whether a liberty interest is implicated by disciplinary segregation depends on both the time and conditions of confinement. . . . ").

### 2.   *Meaningful and Periodic Reviews*

Next, Defendants argue that even assuming a due process claim was implicated, Mr. Dawson's claim fails because there was insufficient evidence for a reasonable jury to conclude that Mr. Dawson was denied periodic and meaningful reviews. Dkt. 170 at 10 (citing Final Jury Instruction 15, dkt. 152 at 16). Defendants argue that "all that Plaintiff established at trial is that

21

the forms evidencing the review results from February 1, 2019 through June 30, 2019, were boilerplate. And therein lies the fault in Plaintiff's presentation: it is the process of the review that the jury is required to evaluate—not the process in providing Plaintiff with the results of the review." Dkt. 170 at 11.

Defendants' argument in this regard is not well taken. When drawing all reasonable inferences in Mr. Dawson's favor, there was a sufficient evidentiary basis for a reasonable jury to find that Mr. Dawson was denied periodic and meaningful reviews. *Bohanon*, 46 F.4th at 674-675. There was considerable testimony regarding the review process. From this testimony, the jury could infer the following:

- A full review (also referred to as a 90-day review) was the only process which could result in a prisoner being transferred out of DWAS. Dkt. 175 at 174. Thus, the jury could conclude that all other reviews, such as the boilerplate 30-day reviews, were a sham because they could not result in Mr. Dawson's release from DWAS. Dkt. 152 at 15 ("A meaningful review does not need to be formal or adversarial, but the review must be open to the possibility of a different outcome.").

- A jury could also conclude that the full reviews were not provided periodically. The full 90-day reviews do not happen automatically every 90 days. Dkt. 178 at 54. Prisoners including Mr. Dawson were never told how to request a full review. *Id.* at 72-73. Mr. Dawson was never asked if he wanted a full review. *Id.* at 174-178. Staff may request a full review, but that does not happen very often. *Id.* at 123-124. Thus, if neither staff nor a prisoner requests full review, then a full review is not conducted, and the prisoner would remain on administrative segregation indefinitely. *Id.* at 131-132. In addition, approximately five months after

22

Mr. Dawson was transferred to DWAS he submitted a Classification Appeal stating that he had not received a 90-day (the full review) and seeking immediate release back to general population because he was not a threat to the safety or security of the facility. Exhibit 5. No full review was completed as a result of this Classification Appeal. A reasonable jury could conclude that a review process that may never be completed is not sufficiently frequent to be considered periodic. Dkt. 152 at 15 (explaining "at a minimum, the periodic review must be sufficiently frequent so that the inmate's placement in segregation does not become a pretext for indefinite confinement.").

- A reasonable jury could further conclude that the full 90-day review Mr. Dawson was provided was not meaningful. Staff initiated a full 90-day review only after Mr. Dawson filed this lawsuit and service was issued to the defendants. Exhibit 3-E; Dkt. 178 at p 58. On August 6, 2019, Jerry Snyder emailed the results of the full 90-day review, stating that Mr. Dawson was "Denied due to OII [Office of Investigation and Intelligence] information of his involvement in a major trafficking ring at MCF in 2017. Will recommend approval with 2 years clear conduct in November 2019." Exhibit 3-G. Mr. Dawson's involvement with the trafficking ring is the same conduct that resulted in his disciplinary segregation sanction, which he had already served. Dkt. 175 at 180. The jury could conclude that Mr. Dawson was not given a meaningful review, but instead was denied release from DWAS simply to punish him for his past conduct for which he already served his disciplinary sanction. Dkt. 152 at 15 ("Prison officials may not use past events alone to justify indefinite confinement.").

The evidence reflects that Mr. Dawson was denied meaningful and periodic reviews while on DWAS. No relief is warranted on this basis.

### 3. Personal Involvement

Mr. Brown and Mr. Snyder argue that they are entitled to judgment as a matter of law because they were not personally involved in the complained-of conduct. Dkt. 170 at 12 (citing dkt. 152 at 19). Specifically, they argue there is no evidence that Mr. Brown or Mr. Snyder were personally involved in performing or initiating the periodic review process. In response, Mr. Dawson argues that Mr. Brown and Mr. Snyder were actively involved in the fraud designed to ignore inmates in administrative segregation and leave them there indefinitely. Dkt. 179 at 10.

The evidence was sufficient to establish Mr. Brown's and Mr. Snyder's personal involvement in denying Mr. Dawson his due process right to periodic and meaningful reviews of his placement in DWAS. This is because Mr. Brown and Mr. Snyder were supervisors actually engaged with the underlying constitutional violation. "[T]o recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Individual liability "may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turn[s] a blind eye to it." *Id.*

First, the evidence reflects that Mr. Brown and Mr. Snyder played a personal role in Mr. Dawson's placement in DWAS. Mr. Snyder sent an email stating that Mr. Dawson was being processed for placement on DWAS, Exhibit 3-A, and Mr. Brown reviewed and signed off on a memorandum recommending that Mr. Dawson be placed in DWAS, Exhibit 8; dkt. 178 at 139.

24

A reasonable jury could infer that these Defendants personally understood that once Mr. Dawson was placed on DWAS that he would be held there without meaningful and periodic reviews.

Second, a reasonable jury could conclude that Mr. Brown and Mr. Snyder put the sham 30-day review protocol in place. Dkt. 175 at 173-179. These reviews were periodic but not meaningful. Specifically, Mr. Snyder was a Unit Team Manager. Dkt. 178 at 48. He testified that the purpose of the 30-day review was to determine whether a prisoner should remain in administrative segregation because he is a threat to the facility. *Id.* at 51. However, Mr. Snyder testified that he understood that the 30-day reviews were pre-prepared forms that took about 30 seconds to complete and that no one was ever released from administrative segregation as a result of a 30-day review. Dkt. 178 at 51-52. Similarly, Mr. Brown was the Warden at Wabash Valley Correctional Facility. *Id*. at 119. He testified that he knew the 30-day reviews were conducted by individuals who had no authority to make the decision to release someone from administrative segregation and that there was no review of individual prisoner's characteristics during the 30-day reviews. *Id.* at 122. A reasonable jury could conclude that the 30-day periodic reviews were a sham designed to falsely suggest that prisoners on DWAS were receiving meaningful and periodic reviews of their placement.

Third, the evidence is sufficient for a reasonable jury to conclude that Mr. Brown and Mr. Snyder knew the full 90-day reviews were not completed sufficiently frequently and that they condoned this practice. Mr. Brown was the decision maker at the facility level for all 90-day full reviews. Dkt. 178 at 123. Mr. Brown testified that staff may request 90-day reviews, but that does not happen very often. *Id.* at 124. Thus, he understood that if neither staff nor a prisoner requests a 90-day review, then a 90-day review is not conducted, and the prisoner would remain on administrative segregation indefinitely. Dkt. 178 at 131. Similarly, Mr. Snyder acknowledged in

his testimony that prisoners are never told how to request a full review, which is the only review that can result in removal from administrative segregation. Dkt. 178 at 72-73. A jury could easily infer that Mr. Brown and Mr. Snyder knew that the full 90-days reviews were the only meaningful reviews and that these reviews were not conducted periodically (meaning, sufficiently frequently).

Thus, the evidence taken in the light most favorable to Mr. Dawson permits the inference that Mr. Brown and Mr. Snyder knew prisoners on DWAS like Mr. Dawson were not provided meaningful and periodic reviews and that they facilitated, approved, and condoned this practice. This is sufficient to support personal liability. *See e.g.*, *Haywood v. Hathaway*, 842 F.3d 1026, 1032-33 (7th Cir. 2016) (holding that the Warden could be held personally responsible for the harm caused by cold prison conditions because the evidence showed he "had actual knowledge of the unusually harsh weather conditions, that he had been apprised of the specific problem with the physical condition of [the plaintiff's] cell (i.e., the windows would not shut), and that, during the time period of [the plaintiff's] complaint, the warden toured the segregation unit himself"); *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding that the Warden was personally responsible for the alleged cell conditions, because the Warden "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed").

In addition, a reasonable jury could further conclude that Mr. Snyder denied Mr. Dawson a meaningful full 90-day review. The evidence reflects that Mr. Snyder initiated a full 90-day review after Mr. Dawson filed this lawsuit. Mr. Snyder participated in the review by reporting the results stating that Mr. Dawson was denied release from DWAS because of his prior involvement with trafficking in 2017 and that approval for release from DWAS would not issue until November 2019. Exhibit 3-G. Mr. Snyder's conclusion was understood by Mr. Dugan to reflect that there was nothing he could do that would result in Mr. Dawson's release from DWAS prior to

26

November 2019. A reasonable jury could conclude that the Mr. Snyder's conclusion was based on past conduct and not Mr. Dawson's current circumstances. This is sufficient to show Mr. Snyder's personal involvement in denying Mr. Dawson a meaningful review.

### 4. Qualified Immunity

"Qualified immunity shields government officials from damages if they did not violate a clearly established, specific federal right." *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (cited by *Mathews v. Brown*, 768 F. App'x 537, 539–40 (7th Cir. 2019)).

Defendants acknowledge that the right to periodic and meaningful reviews was clearly established during the time period relevant to this case. Dkt. 170 at 14. The periodic review must not be a sham or pretext and should provide helpful notice to the inmate as to the reasons for his placement and how he could get out. *Isby v. Brown*, 856 F.3d 508, 527 (7th Cir. 2017).

Defendants argue instead that "the evidence presented at trial shows a concerted effort to ensure that the reviews were meaningful [after February 2019]. Mr. Dugan testified that he took into consideration a multitude of factors when reviewing Plaintiff and that were listed on the review results." Dkt. 170 at 14. But the jury could reasonably reject the assertion that the 30-day reviews after February 2019 were meaningful because the trial testimony reflects that regardless of the information considered, the 30-day reviews and appeals of 30-day reviews never resulted in a transfer out of DWAS. Dkt. 175 at 173-174; *See Isby*, 856 F.3d at 528 ("while submission of new evidence or a full hearing may not be *necessary* to meet the requirements of due process under *Hewitt*, an actual review—*i.e.*, one open to the possibility of a different outcome—certainly is.).

Accordingly, Defendants are not entitled to qualified immunity on the due process claim.

### III. Motion for New Trial

Defendants argue in the alternative that they are entitled to a new trial on the due process claim, because Mr. Brown and Mr. Snyder were prejudiced by Jury Instruction No. 17. Dkt. 170 at 14.

Under Rule 59(a) of the Federal Rules of Civil Procedure a "new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted). A district court's jury instructions are given deference and analyzed as a whole to determine if they accurately state the law and do not confuse the jury. *Doornbos v. City of Chicago*, 868 F.3d 572, 580 (7th Cir. 2017); *see also Sanchez v. City of Chicago*, 880 F.3d 349, 355 (7th Cir. 2018) ("We review de novo whether a challenged jury instruction fairly and accurately summarized the law, but the trial court's decision to give a particular instruction is reviewed for an abuse of discretion.") (citation omitted). "If an instruction is legally deficient, a new trial is required only if the flawed instruction could have confused or misled the jury causing prejudice to the complaining party." *Doornbos*, 868 F.3d at 589; *see also Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018).

Defendants challenge Final Instruction No. 17. That instruction states:

### Final Instruction No. 17

Defendants are being sued as individuals. Neither the Indiana Department of Correction nor the State of Indiana is a party to this lawsuit.

To prevail on his claim against any Defendant, the Plaintiff must prove by a preponderance of the evidence that the Defendant was personally involved in the conduct that Plaintiff complains about.

Dkt. 152 at 19.

Defendants argue that Final Instruction No. 17 should have also included the following statement: "You may not hold any Defendant liable for what the other Defendant did or did not do." Dkt. 146-1 at 19 (Court's Proposed Final Jury Instructions); *see also* Seventh Circuit Civil Pattern Instruction 7.02. But there was no error in not including this statement. As the Court reasoned during the instructions conference, "there were numerous instances where the defendants had pressed witnesses over their involvement or lack of involvement in the conduct that formed the basis of plaintiff's allegations." Dkt. 177 at 24. Taken overall, the instructions given made it clear that to find a defendant liable the jury had to find that he was personally involved. *See Betker v. City of Milwaukee*, 22 F. Supp. 3d 915, 923 (E.D. Wis. 2014) (discussing same instruction).

The Defendants' argument that they are entitled to a new trial because "the jury could properly find a supervisor liable without the requisite knowledge and inaction and was improperly instructed on the law," dkt. 170 at 16, is not persuasive. To the extent Defendants suggest that there was insufficient evidence to support a finding of personal involvement by Mr. Brown and Mr. Snyder related to the due process claim, this contention has been rejected. *See, infra,* II(B)(3).

Further, no theory of respondeat superior liability was developed or at issue. The jury was properly instructed: "To prevail on his claim against any Defendant, the Plaintiff must prove by a preponderance of the evidence that the Defendant was personally involved in the conduct that Plaintiff complains about." Mr. Dugan testified that he reported to his casework manager Randall Purcell, Unit Team Manager Snyder and Warden Brown. Dkt. 175 at 100-101. And the evidence taken in the light most favorable to Mr. Dawson is that Mr. Snyder and Mr. Brown developed the sham 30-day review protocols that never resulted in release from DWAS. Dkt. 175 at 179. Further, the jury found for Mr. Brown on the conditions claim and for Mr. Purcell on all claims, such that there is no basis to conclude that the jury believed that Mr. Brown could be held liable for what

29

another Defendant did or did not do simply because he was the Warden. Given the evidence adduced at trial, there is no plausible basis to conclude that Mr. Brown or Mr. Snyder were found liable based on respondeat superior liability.

Finally, Defendants argue "[i]f the Court believed there was evidence establishing a supervisor's knowledge of Mr. Dugan's performance of the reviews," Seventh Circuit Pattern Instruction 7.23 regarding Liability of Supervisor should have been provided. Dkt. 170 at 16. But Mr. Dawson correctly notes that this argument is waived because Defendants did not tender this instruction to the Court for consideration. Dkt. 179 at 15; *see also* dkt. 120 (Defendants' Proposed Case-Specific Final Instructions).

The instructions given were accurate and complete, and, even assuming that they were imperfect, Defendants have failed to show prejudice in any respect. Accordingly, the motion for new trial is **denied.**

### IV. Conclusion

The motion for judgment as a matter of law, dkt. [169], is **granted in part and denied in part**, and the alternative motion for new trial, dkt [169], is **denied.**

Mr. Dugan and Mr. Synder are entitled to qualified immunity on the Eighth Amendment claim. Accordingly, an Amended Judgment shall be entered reflecting that Defendants Charles Dugan and Jerry Snyder are entitled to qualified immunity on the conditions of confinement claim. Defendants' motion is denied in all other respects.

IT IS SO ORDERED.

Date: 8/23/2023

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

30

Distribution:

All Electronically Registered Counsel